Case number 23-1162, Mia Bennett v. Hurley Medical Center, oral argument not to exceed 15 minutes per side. Nicholas Rommel for the appellant, you may proceed. Morning. Morning, judges. I would like to reserve two minutes for rebuttal, please. Good. Thank you very much. I stand here as a cat person advocating for a dog. But Pistol is an extraordinary dog and worthy of advocacy, and so is Mia Bennett. Mia is a person with a disability. She has a severe anxiety disorder with a history of unexpected panic attacks. She has a legitimate service animal who senses the beginning signs of her attacks and alerts her to take the medication that prevents them. And she's supported not only by her medical provider, but by Hurley's policies that recognize precisely this type of service animal. And without Pistol, Mia risks a full-blown attack that can last for over an hour or to take her medication in advance, which dulls her senses and makes her less oriented, dizzy, and drowsy. And it's not ideal for patients or for her learning. She said in her ADA application when she applied for the accommodation with Hurley that Pistol allows her to take classes without fear. No student should have to be fearful when learning to serve our community as a nurse. So as a student nurse, beginning with her educational rotation at Hurley, which has an educational agreement with that school up north, she was scheduled to work for a total of six half days on Wednesdays on the unit at 7E. 7E was a general medical floor, general medical conditions. Mia's accommodation was to have Pistol accompany her on her shifts. And that was approved pursuant to Hurley's policy. So can I ask an issue? I mean, I guess I should tell you at the outset, my instinct is the hospital was trying, right? They approved this initially. And there was only a change once they had some encounters with people with allergies. I think we would all agree there's nothing ill-intended about that. They were trying to do right by it. What I don't understand is how they were supposed to do this if they kept the accommodation. There wasn't an existing screening for dog allergies. So what they would have had to do with this nursing student for a five-, six-week program, is suddenly launch something. I mean, I'm going to guess that it's not easy to launch something with admitting people. We now have this new question about dog allergies, which I suspect is not as simple as you and I might think it is. I don't know how else they could have handled this, because otherwise they were just always going to be one patient away from having the problem in the other direction. And the thing they were doing, if your client, I mean, it wasn't a terrible idea, to have the dog created, what, on the eighth floor? So fairly close. And, you know, you could be going back and forth. So I don't know. I mean, I did find the requirement that you would essentially have to screen all patients for dog allergies quite striking. That seemed to me like quite an imposition, even aside from the staff situation, which was obviously the real point. Thank you, Your Honor. I appreciate that the hospital did grant the accommodation, and there's a few things to unpack from Your Honor's question. The first thing is that they do screen for all allergies, and that's in the record. They screen for allergies. They ask generally, do you have allergies? Correct. But I just think if you're going into a hospital, you wouldn't think, oh, yes, I'm allergic to cats. I need to put that up, because there aren't cats in hospitals, or dogs for the most part. Why would you put that? I would say amoxicillin or whatever, you know, peanuts. If I were handling that personally, I would say on those six half days when she's there on one discreet floor, just a general alert, you know, you've got to check with the patients. And these are general condition patients. I assume that they're all communicative, if not a patient advocate. Just say, hey, we have a student nurse who's coming here with a service dog. Is that a problem? Hurley's own policies say that allergies are not a reason to not grant the accommodation. Their own policy, 4050, says we will move patients. We will reassign staff. And so when they terminated the accommodation, they were... I would say they modified the accommodation. It seems a little more fair. Fair enough, Your Honor. Fair enough. It's a question of semantics in some ways. I would say they terminated the accommodation because the accommodation that they granted was the accompaniment of that person. And I'm going to skip ahead a little bit because when we look at some of these cases that talk about separating the animal from the person, it is a... Before you get into that... Judge Clay. What I'd be interested in is not so much whether the final decision is one that your client takes exception to, may even have some support in the ADA regulations, but at the point that there was a breakdown in communication here and had the hospital and your client progressed far enough along in trying to discuss and alleviate the problem, and did the hospital, and I don't know what the answer to this would be, fulfill its duties to engage in an interactive process with your client as to whether some mutually agreeable solution could be found. And again, I don't have any predisposition as to what the answer should be, but that part of the case where the two parties under the regulations were supposed to try to solve this, what had been done by the two parties, had enough been done, and did the hospital fail or not to fulfill its duty in that regard? Specifically with regard to the interactive process, we say that the hospital terminated that. There was the email exchange between Summer Jenkins and Mia Bennett on the 15th of September, where Mia said, you know, I can see about getting this so-called shed defender, which is like a cape for the dog that reduces dander. And within hours of that, on the 15th, Ms. Jenkins wrote, no, we are not going to let you have the dog accompany you. You can put it in a crate on a different floor. She said, quote, that is the accommodation that we are able to. She didn't say no, like as in no shed defender. She just said, so your client proposed the shed defender, but said she'd have to check with her mom to see if maybe the size could be altered. And then the next response was, you can't bring your dog. But the hospital didn't say, no way can you use the shed defender. Right? They said that this is the accommodation we are able to offer, your dog in a crate on the other floor. Yeah. And that's the quote. So I would say that's a no. And then he did, but that didn't end the interactive process in the sense that they were still communicating. That's when Mia's advocates, the nurse, the U of M nurse assigned to Hurley, and the student advocate at Hurley advocated for Mia in a meeting with Summer Jenkins and Peter Bade, who was the attorney for Hurley, and that was on the 21st of September, I believe. That was the one that she said, as Jenkins testified, was heated. But that was an argument where they were saying, no, we would like her to be able to have the dog. Now, I don't know specifically if they talked about the shed defender in that conversation, but I think that it's a fair inference from the facts that Hurley, once they terminated the accommodation of you, Pistol being with you, that there was no further give and take, that they just stood by that and didn't do that. Well, I mean, the other way to look at it is that once they said she had to put the dog in the crate, that your client became disenchanted about communicating very much more about the whole problem. In other words, did the hospital ever communicate that they were refusing to speak about the problem anymore? I think that whole thing about the shed defender, honestly, is sort of a red herring. You know, again, I think if you're looking at the inference in the light most favorable to the plaintiff, once they said this is the accommodation we're willing to offer, and then they have a heated argument with her advocate saying let her have the dog with her, the inference is that they were just saying no to any accommodation that would permit Mia to have Pistol with her. And in terms of the accommodation that they were offering, whether that was reasonable or not, when we look at some of the cases, for example, if you look at the Wonder, the dog, the Fry case, the one that went to the Supreme Court, where they spoke with approval of a couple of cases that we relied on, the Sullivan, California case, the Albany, Florida case, both of those cases said that you can't separate a person from their adaptive aid. In this case, it's a service animal. They rejected the argument you're just excluding the animal and not the person, because you're asking the disabled person to take on a different persona. You're saying they function as one unit. It deprives a person of her independence, and it also deprives them of their ability to bond, and it exposes Ms. Bennett, as she said, it allows me to attend class without fear. And if Pistol isn't by her side, to sense her cues. Okay, but that has to be balanced against public safety. And so, you know, you have to talk about the hospital, the hospital's objections, or alternative means of dealing with the problem were reasonable under the circumstances and the impact on hospital operation and public health. So, I mean, we kind of have to talk about both sides together in that respect, don't we? Sure. Well, Your Honor, all of the cases say that this is a highly fact-specific inquiry as to whether an accommodation is reasonable or not, and it is an individualized assessment. And what we've argued in our brief is that they were talking about a lot of generalized things. So, first of all, there's allergies. There's no question. Those were specific. But there's one very important fact that the lower court erred on, that in and of itself would, I believe, merit reversal. The record shows that there were three allergies on that first day, and I'm not disputing that. I'm not minimizing it. One of them was a person who worked every other Wednesday. She was not working on the first day. She was reassigned. It was not a problem. Can I just pause you there? I mean, so staffing was not easy during COVID. Does that enter into this? I think it helps us, Your Honor, because staffing was not easy during COVID. They had a pool of people who filled in for people who were sick, and she was able to accommodate the one nurse no problem. The other one, the patient was discharged the next day. And I think it's also significant that Mia testified. She has never had a problem in any other hospital setting where she had rotations. This would mean, if you're right, that when she's there, no staff that has dog or cat allergies can come. She could have been on the ninth floor where there were no allergic people. What's that? The ninth floor was another place where two Hurley people testified that a student nurse can go there for her rotation on the ninth floor. Were there also allergies on the ninth floor? No. The judge erred when the judge said that, and I spent a lot of time on page 12 and 13 showing that that was an error. It is true that Ms. Jenkins said in one of her emails there's an allergy on nine, but the record showed otherwise. And, in fact, I believe my esteemed counsel concedes that there were just the two allergies that were on seven there. And so that in and of itself. Judge Larson. Is Ms. Bennett still in nursing school? Is she still in nursing school? I believe that she has graduated. So are her claims for prospective relief moot? What does she want? Like an injunction? At this point, I think it's just about damages, Your Honor. Okay. And then what are her damages? Because the Supreme Court told us last year in Cummings v. Premier Rehab that emotional distress damages are not available. So what are her damages? What can she get? What is she asking for? That's a great question, Your Honor. That would be for the lower court to determine on remand. At this point, it could be just a declaratory relief thing. Well, but she can't get declaratory relief unless she has a prospective injury, right? Like that's the standards for a declaratory action and injunctive relief are the same. You have to be facing imminent threat of harm. I would concede Your Honor's point that damages are an issue. I mean, I don't know how else to say that, but Your Honor is correct about that. Why don't you think about that for a rebuttal, and if need be we'll have supplemental briefing on it. Thank you very much, Your Honor. Okay. Thank you. Mr. Edmonds. Please, the Court. Mike Edmonds for Defendant Hurley. I only have two points to make until you guys start asking me questions. This hasn't been addressed in oral argument, but in the briefs there was this suggestion from the plaintiff that once we move people who are allergic that the risk is gone. And I don't think that's fair. Once we have a dog that we know people are allergic to, we have a problem. And just moving the known folks who are allergic to the dog doesn't solve the fact that we have a dog that we know people are allergic to. So initially we couldn't, Hurley can't say you can't bring a dog in here because we might have people who are allergic. But once we have an actual risk instead of a prophylactic risk or a possible risk, now we've got to do something with this dog. And so the briefs have addressed why we can't move the patients, why we can't move the employees. But I want to point out that our attempt to resolve this was to focus on the dog and not the prospective people who might be allergic, and that at that point in time it was a known risk. The second thing I wanted to say is that there's sort of this burden shifting that takes place with respect to the interactive process. Judge Clay asked about the interactive process. The plaintiff says, here's what I want, here's the accommodation I want. And then Hurley says, well, here's our proposal. The question is at that point in time, is Hurley's proposed accommodation reasonable? Because if it is, that's the end of the inquiry. The plaintiff does not have a right to say, I don't like that proposal, here's what I want. As long as the employer's proposed accommodation is reasonable, that ends the inquiry under the ADA and that ends the interactive process. And otherwise Hurley doesn't have an obligation to go back and forth with the plaintiff. All they have an obligation to do is to come up with a reasonable accommodation. What's your answer to Judge Larson's question about what's left in this case? So I'm not an appellate lawyer. This is my first court of appeals argument. I'm a trial lawyer. I deal with the practical effects. And so I like that question. I will tell you, and I think counsel will agree, that throughout this case, this has not been a case about money. Plaintiff and her lawyer are true believers, and they want to change things at Hurley. That's what the fight has been about. That's no longer an option. So I think this is leverage. I think that if I lose the appeal. Slow down a little bit. This is what we try to do at the appellate level, slow down a little. So just, okay, there's nothing more nursing training that she can get there? That's done?  And she finished the training? Correct. At multiple hospitals. Okay. Well, let me ask you this. You say once there's a reasonable accommodation offered, the plaintiff is not entitled to reject that and demand other remedies and so on and so forth. But if there are several reasonable accommodations that could be available, in other words, the accommodation offered by the hospital is reasonable, but it's true that the plaintiff can't select the accommodation just based on personal preference. But if there are several reasonable alternatives available, isn't there room for discussion as to what should be done? And actually in evaluating what's reasonably available, I know there's a cost component for the hospital. One alternative may, one resolution may cost a certain amount of money. The hospital would have to expand. Another one would cost a different amount. Does that get taken into account or factored in to the discussion as well as to in deciding what the burden on the hospital would be, the financial cost and that kind of thing? It could be. Cost is something that can be used as a defense to a requested accommodation. That has not been Hurley's defense here. Hurley is not saying this was too expensive and therefore it was unreasonable. They have said it was an unreasonable request for an accommodation because it presented a direct threat to health and safety. The first part of your question was, is it reasonable to have a discussion when there are multiple potential accommodations, all of which are reasonable? Sure, but that's not what the law required. So whether that's something that should happen or not, can happen, is frankly irrelevant. The law says, this is the Jakubowski case, which is the Sixth Circuit Court of Appeals opinion, says once there's a reasonable accommodation offered by the employer, that ends the inquiry. If there's a possibility of multiple accommodations, all of which are reasonable, plaintiff doesn't get to pick. But what if there's a factual dispute between the parties as to what is reasonable? The hospital says we're offering you something that's very reasonable. The plaintiff says, okay, but that doesn't work for me. It's not a reasonable proposal. It's just not workable. Then what criteria is available or can be used to decide what's reasonable? What do the regulations say about that, if anything? The regulations don't address that specifically, but that's what trial courts do every day. Trial courts with reasonableness and causation and all kinds of issues say, this is normally a jury question. However, there is not a genuine issue of fact unless a reasonable jury can find in favor of the plaintiff. So the trial court said no reasonable jury could find that Hurley's offered accommodation was unreasonable. Therefore, that's the end of the inquiry. And that's really the heart of the matter. Who decides this case, the jury or the judge? And if no reasonable jury could find that Hurley's requested accommodation was unreasonable, then it's up to the judge. To finish answering the question about damages, I believe what's going on here is plaintiff, if this were to return to the trial court and we had a trial, plaintiff could recover nominal damages and attorney fees. So she could recover money. But just go ahead, Judge. No, you started this. Go ahead. But you can't keep a case alive with attorney's fees. Yeah, but nominal damages you can. But I thought Judge Larson was pointing out that the Supreme Court said that you don't get nominal damages. Where do you get nominal? Well, what the Supreme Court said is last year. You don't get emotional distress. You can't get emotional distress damages. We allow nominal damages for constitutional violations. Do we allow nominal damages for statutory violations? Not legally. I was using the term as a practical term. What I'm pointing out is that plaintiff's lawyer, as a good lawyer, could prove his case and then say to the judge, if proved at trial, my client has lost $600 in lost wages because she missed work because she didn't have her dog. There's no wages here. This is a student. In the course of ADR, there was a minor claim made for economic damages. And all I'm saying is that a good lawyer like Mr. Rommel is could try this case over a nominal amount of money and then get attorney fees. The only thing that you said that matters is you're saying there is something in the case about modest economic damages. Sure. There still is. Sure. And I think what's really going on is Don't go to the motive thing. But I have one more question about this. So the other thing about the ADA is, as I understand it, the ADA borrows its remedies from Title VI. And Title VI says you can only get damages, even compensatory damages, for a claim of intentional discrimination. So is all that's left in this claim, because there's no prospective relief, that seems to be true, all that's left is the intentional discrimination claim? No. So there's a dispute in the Sixth Circuit about whether a claim for an accommodation is also intentional discrimination. I believe there's two different claims, intentional discrimination and failure to accommodate. And we have both of those claims in this case. I'm not sure I'm understanding that point. I thought the split in the Sixth Circuit, you have intentional discrimination claims by themselves. Then the question is whether the statute has a reasonable accommodation claim. It doesn't make reasonable accommodation an intentional claim. So the statute prohibits Because there's a regulation, and the question is whether the regulation validly creates this cause of action. Why does that prove a reasonable accommodation claim is an intentional discrimination claim? I don't believe it does, but that's Plano's argument. I'm just acknowledging the argument. The statute says thou shalt not discriminate based on disability, and thou shalt provide accommodations. So the argument from the Plano's bar is that the failure to accommodate is intentional discrimination. I don't think that is accurate. I think there are Purposes of this damages point. Correct. So if the Plano proceeds on a failure to accommodate, that would be I think that would To the point Judge Larson, I thought of her question, I don't know, was listen, if all that's at issue is the intentional discrimination case when it comes to this minor economic damages, that may be all the court needs to address. I'm following you, and I'm agreeing that if you agree with me that failure to accommodate is not intentional discrimination, and you do not find any intentional discrimination, that there would be no damages. I got it. All right. You're a good appellate lawyer. I know what you're worried about. I have tried 49 jury trials, and I will take number 50 rather than do this again. Oh, no, don't say that. We're a very welcoming place. But anyway, you did another very good thing, end early. We love that as well. So let's do rebuttal. Okay. Thank you. And I would love to have number 50, the honor of doing that with esteemed counsel. Okay. So I know exactly why you want that. That's the point of your appeal. But what's your answer to this minor injury that Judge Larson raised? First of all, I think I was mistaken. I don't think she has graduated. The 2021 year was her freshman year. So that would mean 23, 24 is her senior year. She theoretically does have future rotations at Hurley, not just in her undergraduate, but in the course of nursing, knowing my daughter is a nurse, there are several degrees you can get. She could have future rotations at Hurley. Well, but is she planning to get another degree? Does she have future rotations at issue? Well, she's still an undergraduate, so that's still alive, that claim. Right. But if that's only a part of the freshman or sophomore, I mean, I don't know what's a part of the curriculum. But it sounded like there is an economic damages claim, not a lot, but there is one. Well, under the Persons with Disabilities Civil Rights Act, which is a state claim, she can get damages under that, and she can, unlike what the courts have held about the Rehab Act. So that's a viable claim. So she can get emotional distress damages under a state law claim. Correct. Is that still in the case? Yes. And your opposing counsel says you've argued something about some minor amount of compensable out-of-pocket, you know, pocketbook damage. He's given that to you. I did. And to be honest, Your Honor, because that wasn't part of the appeal, I can't really. And just a couple other things I wanted to say real quick. Can I just say just one thing? Yes, Your Honor. One reason this was getting our attention is, you know, do we have a moot case? I mean, that's what was occurring to me. So the only reason you need to give us supplemental authority is if you go back and think about this and you realize, wait a second, there is nothing we can do, that's a very important point to let us know. So both of you work with each other if you think there's something to let us know. We're going to assume for now that what we've heard is accurate, that our economic damage is lingering, there's a state law claim of emotional distress, that's enough for us to proceed. But we obviously don't like to do resolved moot cases. We'll certainly alert the court if there's something that the court should know in response to that question. All right, so make your key point. Yeah, last couple points where failure to accommodate is a form of discrimination. I cited that in my brief. But the most important thing is that Hurley's offer, the courts have held it's not a reasonable accommodation if it's not effective. And it's a triable issue whether their offer of crating the dog was a reasonable accommodation. If it's not effective, it's not reasonable. And if that dog is in a crate on a different floor, it can't alert her about an impending panic attack, therefore it's not effective. And that's a triable issue in and of itself. Judge Larson said in a case that I didn't actually cite, but it was an interesting quote, there's a prisoner case named Keller where a man with a prosthetic leg was making a failure to accommodate claim. And ultimately there wasn't quite enough facts to reach that issue. But Your Honor said that just because he was able to use the toilet doesn't mean that he had meaningful access. And so that's the same kind of thing. Just because she was able to gut through without pistol doesn't mean that she had meaningful access, doesn't mean that she wasn't excluded from the full benefits of participation, et cetera. Yeah, just real quick. Has she ever argued how she was not provided meaningful access? In other words, she didn't have a panic attack. She did complete the course. I mean, the best analogy, and I asked many people on depositions, I said, what if we were talking about a service dog for a blind person? Would you crate the dog in another floor? Would you put their cane in a locker on a different floor? You know, just because they're able to walk through and not fall into anything doesn't mean they weren't deprived of the full benefits. I mean, the statutes talk about the full benefits, the full enjoyment. And she talked about the ability to go to class without fear. I mean, that's – Yeah, but that just sounds to me a little bit like emotional distress damages which aren't available. I think there's a – And if there's no claim for prospective relief, but maybe there is. That's interesting. I'll sort that out. Thanks to both of you for your helpful briefs and arguments. We really appreciate it. And as always, thank you for answering our questions. Thank you very much, Pamela. Thanks to both of you. Thank you. The case will be submitted.